IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

**PATRICIA H.,**

        **Plaintiff,**

v.                              **Civil Action 1:23-cv-349**
                                **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## OPINION AND ORDER

Plaintiff, Patricia H., brings this action under 42 U.S.C. § 405(g) seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors, entitled Motion for Judgment on the Pleadings (Doc. 10) and Plaintiff's Brief in Support (Doc. 11), and **AFFIRMS** the Commissioner's decision.

**I.**     **BACKGROUND**

Plaintiff protectively filed her application for DIB on June 11, 2021, alleging disability beginning May 1, 2020, due to blind or low vision, abdominal nerve damage and entrapment (ACNES), fibromyalgia, and depression. (R. at 188–89, 203). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on June 8, 2022. (R. at 39–72). The ALJ denied benefits in a written decision on June 16, 2022. (R. at 10–38). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. (R. at 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on June 7, 2023 (Doc. 1), and the Commissioner filed the administrative record. (Doc. 7). The matter has been briefed and is ripe for consideration. (Docs. 10, 11, 13).

### A.     Relevant Hearing Testimony

The ALJ summarized Plaintiff's reports and testimony about her impairments:

> She lives with her husband. She can drive and has no medical restriction on her license, but typically her husband takes her because she has blurred vision in her left eye. She has a high school education plus several years of college; she has no degree. She owned her own travel agency business; she had employees until COVID, and then she tried to do it herself. Her conditions got worse. She has not performed travel agent services since the amended onset date. The business is an S corporation; it is still in existence, but she is trying to sell it. The business filed a tax return for 2020 but not for 2021. The 2021 revenue will be a loss. The business has not had a profit in the last five years. About six years ago, she lifted something heavy, and something popped in her stomach. She was diagnosed with nerve entrapment syndrome as well as an umbilical hernia. She has pain from walking and lifting. She treated with pain management; she received trigger point injections in her stomach, which helped initially, but not over time. She had a trial spinal cord stimulator that did not work. Use of a TENS unit and physical therapy did not help. She went to Ohio State and had surgery; two nerves were un-entrapped, but some remain entrapped. The doctor cannot promise that additional surgery will be successful; she does not want to chance it. The surgery gave her a bit of relief; she was in so much pain before that she had "bad thoughts." However, she is still in terrible pain every day, even when she sits. She has been diagnosed with complex regional pain syndrome; she is on pain medications and wears a belly band. She takes hot showers and sits with a heating pad; she also uses Ben Gay. In addition, she has fibromyalgia and sciatica and low back pain with radiculopathy that causes problems in her left leg. She has to get up from sitting after 10 or 15 minutes. She had a fall in July 2020, and she bought a cane after that to help with her steps. She has water on one knee; it has been drained a couple times. She rotates between sitting and standing; she can stand about 10 minutes and walk about 50 steps. She cannot walk a city block. She can sit 20 minutes then needs to slouch back or recline. She has arthritis in her hands that affects her ability to type. Her hands and fingers hurt, cramp, and shake; she has knots. She was on the computer all day when she was working. Now, she only uses a laptop for security cameras and does not use it or a smart phone for social media or bill paying. She wears a brace on her right hand for carpal tunnel. She can lift a half gallon but not a gallon; she estimates she can lift five to eight pounds. Pain also

> affects her sleep. The vision in her left eye is blurry even with prescription glasses. This causes her to do things at a slower pace. Her medications make her sleepy and dizzy; she takes naps often. She has depression and anxiety and also takes medications for these. Her depression and anxiety affect her energy, sleep, and her ability to concentrate and think. She takes naps often. She cannot deal with people, and she is not sociable like she used to be. She gets antsy around others. She can fix lunch for herself and her husband; then she lies down or sits outside. She likes to cook and fixes dinner; she alternates between sitting and standing. (Hearing Testimony).
>
> She endorsed similar symptoms in her July 2021 Function Report. She noted she could not sit, walk, or stand for more than one hour or two. If she sat more than an hour, she had to take hydrocodone for pain. Her legs also fell asleep while sitting too much. She reported she did not handle stressful situations well and became emotional if confronted; she was easily aggravated. She could care for cats and do some household chores. She had no problems with personal care. She could make complete meals; she could do laundry once per week. She did not need reminders for personal care or taking medicine. She went outside most days; she could drive a car and go out alone. She could shop in stores or by computer; she could handle money. She engaged with others via email and text. She socialized less than she previously did. She reported difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and concentration. She could walk 100 yards. She followed instructions and got along with authority figures well. She did not handle stress well. She reported medications caused sleepiness. She did not report use of a cane. (Exhibit 4E).

(R. at 23–25).

    **B.    Relevant Medical Evidence**

At step two, the ALJ discussed Plaintiff's medical records and symptoms regarding her physical impairments:

> Records show [Plaintiff] complained of some knee pain and swelling after twisting her knee in November 2021. She was prescribed Diclofenac by primary care. (Exhibit 16F). An orthopedic note from late 2021 indicates x-rays showed effusion; her knee was aspirated and injected, and she was advised to use ice. There is no indication she had ongoing orthopedic treatment. (Exhibit 19F). Similarly, [Plaintiff] complained of hip pain prior to her amended onset date; she was assessed with bursitis, but the evidence shows no ongoing treatment. (Exhibit 12F).
>
> [Plaintiff] saw a provider in 2020 for her vision. She reported she wanted to try contact lenses but denied complaints or vision issues. Her unaided acuity was

> 20/50. She was prescribed contact lenses. (Exhibit 1F). In October 2021, she reported blurred vision. Her vision was assessed at 20/30. She was assessed with nodular degeneration on the left as well as bilateral corneal arcus and bilateral cataracts, myopia, astigmatism, and presbyopia. However, the treatment plan was monitoring of the condition and changing her prescription glasses. (Exhibit 14F). In December 2021, she reported her left eye was blurry and her right eye prescription was too strong. She asked for an updated prescription. Her visual acuity was 20/40 bilaterally. She was assessed with Fuch's corneal dystrophy and she was prescribed drops. She was otherwise instructed to report changes in the condition, but treatment was suggested as monitored intervals. She followed up in May 2022 and complained of difficulty seeing distance; she also had headaches from changing out prescriptions during the day. Her acuity remained 20/40. She was advised to continue using drops and to monitor the conditions. (Exhibit 23F). The records therefore show chronic vision problems but no significant deficit in visual acuity. [Plaintiff] was still capable of driving; she could also perform activities of daily living independently, including cooking and shopping. (Hearing Testimony, Exhibits 4E, 5F). The evidence suggests conservative, intermittent treatment for her vision and no significant limitations on her ability to perform work activity[.]
>
> A December 2021 CT scan of the abdomen showed mild degenerative changes in the lumbar spine at L2-L3. (Exhibit 17F). There is no indication [Plaintiff] complained of back pain or treated for any spine abnormalities.
>
> \*\*\*
>
> [Plaintiff] reports arthritis in her hands. Her questionnaire completed by Dr. Coffman included diagnoses of "knots" in the palms of her hands; however, he also reported no manipulative limitations. (Exhibit 20F, Hearing Testimony). The evidence contains no imaging or clinical signs to support objective abnormalities in [Plaintiff]'s hands or upper extremities[.]

(R. at 17–18).

The ALJ also discussed Plaintiff's mental impairments:

> [Plaintiff] appeared for a consultative psychological consultation in September 2021 with Dr. Jinhui Wang. She reported she was limited in work because she could not sit or stand for a long period of time, and she had problems with her arms, legs, and hands. She reported she took care of her parent; she was married with no children. She reported a history of emotional, physical, and sexual abuse; she denied a family history of mental illness. She completed the 12th grade in regular education and three years of college. She reported vocational training as a travel agent. She reported she worked as a travel agent but stopped in 2019. Psychological problems did not interfere with her job. She got along with people well and the work was completed satisfactorily; she used various methods to cope with work

4

> pressures. She still tried to help people; she did it for free. However, she noted she could not sit for more than two hours and could not do the duties of her old job. She reported she currently had depression and anxiety; she disliked crowds. She used to be social but did not like being around people anymore. This started in 2008. She had no therapy. She was prescribed Duloxetine. Medication helped; she had no hospitalizations. She lived with her husband and could perform independent personal care. She tried to cook, and she did laundry. She could drive, grocery shop once per week, and she could get to a doctor if ill. Her activities of daily living were primarily impaired by physical health problems. She could socialize with her husband, her mother, and her aunt; however, she was not interested in anything. She played with her cats and liked to cook; she prepared a big meal in the evenings. Pain caused her stress. On examination, she was cooperative with average social skills. She was dressed and groomed appropriately. Her language and thought content were normal. She appeared sad and her affect was congruent. She had adequate eye contact; she denied suicidal or homicidal thoughts. She showed no signs of hostility or aggressiveness. She showed no behavioral or autonomic signs of anxiety. She was alert and responsive; she showed no indications of delusions. She showed no problems with understanding, remembering, attention, or concentration. Distractibility was not observed; her concentration and persistence were satisfactory; she could remain on task and work at an adequate pace. Her intellectual functioning appeared average. She showed no impairment of reasoning or judgment. Dr. Wang diagnosed unspecified depressive disorder. (Exhibit 5F). Records show no formal mental health treatment with psychiatric professionals or psychotherapists. In primary care notes from May 2020 and August 2021, she told Dr. Shawn Coffman her symptoms of depression were controlled with Cymbalta. Her depression was noted to be stable. (Exhibit 16F).

(R. at 18–19).

At step four, the ALJ summarized the medical record concerning Plaintiff's fibromyalgia, chronic pain, knee issues, and nerve entrapment as follows:

> *** Prior to her amended onset date, [Plaintiff] was assessed with a chronic pinched nerve, complex regional pain syndrome, and abdominal pain. She reported a nerve block gave short-term relief. She underwent a spinal cord stimulator trial in September 2019. She had another nerve block injection in October and was prescribed Nucynta. She had ongoing pain in January 2020 and underwent another nerve block injection. Her pain persisted in May; she reported no improvement from the stimulator trial. She was continued on medication as well as scheduled for another nerve injection. In June, her pain management providers indicated they would make a referral to attempt to find a surgeon. (Exhibits 2F, 10F). In August 2020, she told primary care if it were "not for her nerve entrapment syndrome, she would feel well." She reported Cymbalta helped with fibromyalgia pain. Dr. Shawn Coffman indicated her fibromyalgia was controlled. In December, she reported her chronic abdominal pain was stable with Norco. At that time, she also complained

5

of left hip pain; this started after she had been "in and out of a car multiple times running errands for her mother and aunt." Her fibromyalgia was again assessed as stable; she was prescribed Voltaren and Tegretol for bursitis of the left hip. Her nerve injury was also noted to be stable with Norco. (Exhibit 12F).

In March 2021, [Plaintiff] consulted with Dr. Amy Moore. She reported chronic abdominal pain since her abdominoplasty and total hysterectomy in 2006. She had been diagnosed with anterior cutaneous nerve entrapment syndrome between T10 and T11. Her pain was constant; without medications, it was 7 to 10/10; with medication, it was 5/10. She was using Hydrocodone. She reported walking, sitting, laying and stretching all hurt. She reported she took Cymbalta for fibromyalgia. On examination, she showed a soft abdomen with no hernia or bulges; she was tender near her umbilicus. Dr. Moore discussed abdominal wall exploration, and [Plaintiff] elected to proceed with surgery. She was continued on Cymbalta and Lyrica was also added. In late May 2021, Dr. Moore performed an exploration of the abdominal wall, removal of a foreign body, and a neuroma excision and transposition into the rectus abdominis. She reported some post-surgical pain in early June in the right upper abdomen; this was 6/10. She was taking Hydrocodone and Lyrica; her incision appeared intact. She was noted to be recovering appropriately. She was advised to avoid heavy lifting and straining, but she could otherwise increase activity as tolerated. (Exhibit 3F). She reported ongoing pain in late June, but she noted it was relieved by lying down. Her incision was healed but she was numb over her umbilicus. As of August, she reported her nerve pain seemed to be "gone." She had pain in the umbilicus, and her endurance was "not great." She described pain as 5/10 and she was happier about the pain. She could wear undergarments. Her pain was no longer stabbing and jabbing, but it was not gone; she still needed to take a narcotic. She was advised to increase Lyrica and to continue physical therapy to work on desensitization and core strengthening exercises. (Exhibit 6F).

At a primary care visit in August 2021, [Plaintiff] told Dr. Coffman she continued to have abdominal pain after her surgery, but the Lyrica helped dull the pain and Norco was effective on an as-needed basis. She noted she was again able to work full-time as a travel agent. However, she had difficulty sitting for extended periods of time as this exacerbated her pain. She reported she was self-reliant in usual daily activities. (Exhibit 16F). Records show she engaged in physical therapy in the summer of 2021. She reported in July, she was independent with all activity, she just had pain. By late August, however, she reported feeling "alright"; she noted she bought a recumbent bike and had been riding at home. In early September, she reported she was feeling well overall; she was doing "much better since her surgery." On the "current" September evaluation compared to the initial evaluation, she was assessed with only mild problems, mild pain, and mild weakness or normal strength compared with moderate problems and severe pain initially. She was discharged from therapy to maintain home exercises. (Exhibits 7F-9F). In October 2021 follow up with Dr. Moore and physician assistant Julie West, she again reported her nerve pain seemed to be "gone" superficially; however, she felt a

6

deeper pain. She reported physical therapy helped; she still had pain at 5/10, but she was happier about the pain. She reported the pain was different; it was not stabbing and jabbing, but it was also not gone. She still needed narcotics to help the pain, at times. She noted Lyrica was helping a lot. She reported she was not working because of the persistent pain. On examination, she showed pain in the lateral right abdomen and on the left side of the umbilicus; it was worse in these areas upon deeper palpation. She had no obvious hernia. Dr. Moore planned to order additional imaging and would then discuss a potential nerve block versus further exploration. (Exhibit 13F). A November 2021 primary care visit indicated she had improvement with Lyrica and she required less Norco. She did report weight-gain from Lyrica. She reported she also had some knee pain and swelling after she twisted it; however, she was doing all her normal activities of daily living and she was sleeping well with Ambien. She was started on Diclofenac for knee pain but otherwise she was continued on Lyrica for chronic pain syndrome. (Exhibit 16F). Imaging from December 2021 showed a small umbilical hernia as well as post-surgical changes; however, there were no fluid collections or inflammatory processes in the abdominal wall. (Exhibit 17F). Records show no additional surgical treatment or evaluation. Though [Plaintiff] testified to use of a cane, there is no indication she required a cane during examinations with providers.

[Plaintiff]'s records show ongoing pain related to her nerve entrapment syndrome as well as chronic diagnoses of fibromyalgia and complex regional pain syndrome. However, records show she was capable of working through her pain into 2020 and 2021. (Exhibits 12F, 16F). [Plaintiff] had surgery prior to her amended onset date; since July 2021, she reported improvement in August, September, and October appointments. (Exhibits 7F-9F, 13F, 16F). [Plaintiff] acknowledged ongoing pain but reported only mild symptoms and mild weakness to physical therapy by September 2021. (Exhibit 7F). She remained independent with activities of daily living including driving, cooking, and providing assistance for her mother and aunt. (Exhibits 4E, 5F, Hearing Testimony). [Plaintiff]'s records therefore show improvement with surgery[.]

(R. at 25–27).

### D. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2025, and has not engaged in substantial gainful activity since July 1, 2021, her amended alleged onset date of disability. (R. at 16). The ALJ determined that Plaintiff suffers from the severe impairments of nerve entrapment syndrome with complex regional pain syndrome ("CRPS") and fibromyalgia. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly

7

or in combination, meets or medically equals a listed impairment. (R. at 18).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except with: Frequent use of hand controls and foot controls; frequent reaching, handling, and fingering; no climbing of ropes, ladders, or scaffolds; can perform other postural activities no more than occasionally; with occasional exposure to unprotected heights, moving mechanical parts, extreme temperatures, humidity, and vibration; and occasional operation of a motor vehicle.

(R. at 22–23).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (R. at 25). The ALJ relied on testimony from a Vocational Expert ("VE") to determine that Plaintiff is unable to perform her past relevant composite job consisting of two jobs: manager, travel agency, and travel agent as performed. (R. at 29–30). The VE also testified that Plaintiff has acquired work skills from past relevant work. (R. at 30). Considering her age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. at 30–31). Consequently, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since July 1, 2021. (R. at 31).

## II.  STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting

*Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

In her Brief in Support of Motion for Judgment on the Pleadings, Plaintiff argues that the ALJ erred by not fully developing the record and by failing to consider her impairments in combination. (Doc. 11 at 9–17). On both points, the Undersigned disagrees.

### A. Record Development

Plaintiff first asserts that the ALJ failed to develop the record under 20 C.F.R. 404.927, citing a case from the Southern District of West Virginia, which states the ALJ has a duty to develop the record even when a claimant is represented by counsel. (Doc. 11 at 11). But that is not the applicable standard in this district or circuit. The Sixth Circuit instructs that "absent… acute circumstances," the ALJ is not under a heightened duty to develop the record, "even where a claimant is unsophisticated and appears without counsel." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 564 (6th Cir. July 27, 2022); *see also Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (holding that only "under special circumstances—when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures" does an ALJ have a special duty to develop the record). While the ALJ must ensure the claimant receives a "full and fair hearing," the burden of proving entitlement to benefits ultimately rests on the claimant. *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); 20 C.F.R. § 404.1512(a). Here, Plaintiff is represented by counsel, and as such, the ALJ had no heightened burden to develop the record. *Cf. Lashley v. Sec'y of Health & Hum. Servs.*,

9

708 F.2d 1048, 1051 (6th Cir. 1983) (finding ALJ had a duty to develop the record where Plaintiff was unrepresented, had limited intelligence, appeared confused, and had only a twenty-five-minute hearing).

But Plaintiff also argues that the ALJ ignored her testimony and medical documentation "from [her] treating physician of [her] medical and mental impairments and the limitations they cause [her]." (Doc. 11 at 15). While Plaintiff does not explain which medical providers the ALJ ignored, she discusses her medical history at length, focusing on her anterior cutaneous nerve entrapment syndrome (ACNES), sciatica, arthritis, knee pain, vision issues, and depression. (Doc. 11 at 12–15). The Undersigned addresses the ALJ's analysis of each in turn.

First, the ALJ determined that Plaintiff's ACNES was a severe impairment. (R. at 16). But based on the objective medical evidence provided, the ALJ found that Plaintiff did not meet the requirements of any listings and that her nerve condition seemingly improved with treatment. (R. at 22, 26). As the ALJ discussed, Plaintiff told medical providers that her pain medication helped her symptoms, that she was exercising on a recumbent bike at home, that she was feeling well overall, and that her nerve pain was sometimes "gone." (R. at 26, citing R. at 350–51, 357–58, 360, 362, 364–81, 386–90, 393–413 418–21, 436–37, 601, 603–04, 607–08). While Plaintiff continued to report some level of pain, the ALJ concluded that despite her symptoms, Plaintiff still managed to complete daily living activities and worked some in both 2020 and 2021. (R. at 27, citing R. at 45–48, 221–25, 343, 546–47, 548–49, 601, 603–04, 607–08). The ALJ then provided limitations for this condition in Plaintiff's RFC:

> [A]ny ongoing abdominal pain or generalized pain from her chronic impairments are adequately accommodated by a restriction to sedentary work except with frequent use of hand controls and foot controls; frequent reaching, handling, and fingering; no climbing of ropes, ladders, or scaffolds; can perform other postural activities no more than occasionally; with occasional exposure to unprotected

>heights, moving mechanical parts, extreme temperatures, humidity, and vibration; and occasional operation of a motor vehicle.

(R. at 27).

The ALJ also considered Plaintiff's testimony about her sciatica but highlighted Plaintiff's ability to care for her cats, do household chores, cook, complete personal care tasks, shop, and drive a car. (R. at 24, citing R. at 45–48, 51–52, 221–25). Nonetheless, the ALJ accounted for this impairment by limiting Plaintiff to sedentary work; no climbing of ropes, ladders, or scaffolds; and only occasional exposure to unprotected heights and operation of a motor vehicle. (R. at 22–23).

The ALJ discussed Plaintiff's arthritis and knee pain as well. The ALJ explained that while Plaintiff was prescribed Diclofenac and underwent aspiration and injection for her knee, "there is no indication [Plaintiff] had ongoing orthopedic treatment." (R. at 17, citing R. at 647–50). Additionally, the ALJ noted Plaintiff's reported arthritis in her hands but pointed out that no "imaging or clinical signs" supported "objective abnormalities in [Plaintiff's] hands." (R. at 18, citing R. at 50, 53–54, 651). Despite these inconsistencies between Plaintiff's subjective reports and the objective medical evidence, the ALJ still included limitations for these conditions in the RFC, restricting Plaintiff to "sedentary work with frequent use of foot controls; no climbing of ladders, ropes, or scaffolds; occasional other postural activities; occasional exposure to unprotected heights, moving mechanical parts, extreme temperatures, humidity, and vibration; and occasional operation of a motor vehicle." (R. at 17). The ALJ also limited Plaintiff to "frequent use of hand controls and frequent reaching, handling, and fingering." (R. at 16).

Next, the ALJ examined Plaintiff's vision issues, highlighting her previous diagnoses of nodular degeneration in her left eye, bilateral corneal arcus, bilateral cataracts, myopia, astigmatism, and presbyopia. (R. at 17, citing R. at 574–76). But the ALJ also acknowledged that

11

Plaintiff remained capable of driving, cooking, and shopping. (R. at 17, citing R. at 45–46, 223–24, 343). Ultimately, after considering treatments Plaintiff underwent for her vision issues, the ALJ determined that restrictions of occasional exposure to unprotected heights or moving mechanical parts, along with only occasional operation of a moving vehicle, were appropriate. (R. at 17, citing R. at 659–65).

Finally, the ALJ discussed Plaintiff's mental health at length and concluded that her depression does "not cause more than minimal limitation[s]." (R. at 18–21). Notably, the ALJ found that psychological problems never interfered with Plaintiff's work, that medication helped her depression, that she still completed daily living activities and chores, and that she never sought "formal mental health treatment with psychiatric professionals or psychotherapists." (R. at 18–21, citing R. at 343, 601, 603–04). The ALJ also highlighted that Plaintiff's depression was "stable" and controlled with medication. (R. at 19, citing R. at 604). But because the ALJ concluded that Plaintiff's mental health limitations "are so slight that they do not cause any measurable loss of function," the ALJ did not include any additional limitations in the RFC. (R. at 19–20).

In sum, the ALJ did not ignore these conditions. The ALJ considered the record as a whole and crafted an RFC that incorporated limitations for the medical conditions discussed above. Substantial evidence supports his decision.

### B. Impairments

Next, Plaintiff argues that the ALJ failed to consider the combined effect of her various medical conditions. (Doc. 11 at 15). But "[a]n ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings." *Loy v. Sec'y of Health & Hum. Servs.*, 901 F.2d 1306, 1310 (6th Cir.

1990) (quoting *Gooch v. Sec'y of Health & Hum. Servs.*, 833 F.2d 589, 592 (6th Cir. 1987), *cert denied*, 484 U.S. 1075 (1988)). If the ALJ's decision is made after careful consideration of the entire record and substantial evidence supports that decision, this Court may not reverse. *See Gooch,* 833 F.2d at 592; *see also Hess v. Astrue*, No. 2:09-cv-00124, 2010 WL 1257522, at *4 (S.D. Ohio Mar. 29, 2010) ("Ultimately, the administrative law judge is the finder of fact.").

Here, the ALJ did just that. The ALJ found that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (R. at 21–22); *see Loy*, 901 F.2d at 1310. As shown by his decision, the ALJ came to this conclusion after examining all of Plaintiff's alleged medical conditions: nerve entrapment syndrome, fibromyalgia, complex regional pain syndrome, carpal tunnel syndrome, knee pain, bursitis, vision issues, degeneration in the spine, arthritis, depression, and insomnia. (R. at 16–22).

For example, in finding that Plaintiff's conditions individually or in combination did not meet or equal any listings, the ALJ discussed that Plaintiff's conditions seemed to be responsive to treatment. (*See* R. at 22, citing R. at 569–71, 628–29 (finding Plaintiff's nerve entrapment syndrome improved after treatment); R. at 22, citing R. at 546, 548–49, 551, 559–60, 562–63 (stating that Plaintiff's fibromyalgia was stable and improved with medication); R. at 19, citing R. at 552, 601, 604, 614 (discussing that Plaintiff's mental health symptoms were stable and controlled with medication and that she sought no "formal mental health care"); R. at 17, citing R. at 545–46, 548–50, 601–02, 608–09 (noting that Plaintiff's knee and hip pain responded to conservative treatment methods like medication and ice)). The ALJ also explained that Plaintiff was still capable of numerous daily activities, including driving, cooking, shopping, personal care, laundry, socializing with relatives, caring for her cats, and handling money. (R. at 17–19, citing

45–48, 221–24, 343). More still, for several of Plaintiff's conditions, the ALJ could not find objective medical evidence supporting Plaintiff's alleged symptom severity or confirming these diagnoses. (R. at 16, citing R. at 532–65, 589–627, 628–31 (finding no "positive clinical signs or neurodiagnostic testing" confirming carpal tunnel syndrome); R. at 17–18, citing 628–31 (finding that even though a CT scan showed "mild degenerative changes in the lumbar spine," Plaintiff did not complain of back pain and did not receive treatment); R. at 18, citing R. at 651 (discussing that the record contains no imaging or clinical signs to support Plaintiff's arthritis diagnosis); R. at 19, citing R. at 589–627, 601, 604 (stating that Plaintiff received no formal mental health treatment from psychiatrists or psychotherapists and noting that her insomnia and depression are stable)). And as required by the regulations, the ALJ included limitations in Plaintiff's RFC for nearly all her medical conditions, even though many were determined to be non-severe impairments. *See* 20 C.F.R. § 404.1545; 20 C.F.R. § 404.1520; Social Security Ruling 98-6p.

Therefore, the ALJ's decision shows that he reviewed the medical evidence, along with Plaintiff's alleged diagnoses and symptom severity, and crafted an RFC based on the record as a whole. *Murray v. Comm'r of Soc. Sec.*, No. 2:20-cv-4488, 2021 WL 5413960, at *5 (S.D. Ohio Nov. 18, 2021) ([T]he ALJ considered the impairment when assessing the medical evidence and deciding how his impairments impacted his ability to work. And that is all the ALJ is required to do."). While Plaintiff "wishes the ALJ had interpreted the evidence differently," substantial evidence supports the ALJ's decision. *Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7 (S.D. Ohio May 20, 2016), *report and recommendation adopted*, No. 2:15-CV-01831, 2016 WL 4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017).

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors entitled

Motion for Judgment on the Pleadings (Doc. 10) and Plaintiff's Brief in Support (Doc. 11) is **OVERRULED**.

      IT IS SO ORDERED.

Date:   November 29, 2023                         /s/ Kimberly A. Jolson
                                                                           KIMBERLY A. JOLSON
                                                                           UNITED STATES MAGISTRATE JUDGE